# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HASBRO, INC.,

        Plaintiff,

    -against-

INFOGRAMES ENTERTAINMENT, S.A. a/k/a
ATARI, S.A.,

        Defendant.

C.A. No. 09 Civ. 610 (S) (LDA)

### PLAINTIFF AND COUNTERCLAIM-DEFENDANT HASBRO'S FIRST SET OF REQUEST FOR ADMISSIONS TO ATARI, S.A.

PROPOUNDING PARTY:   Plaintiff and Counterclaim-Defendant, HASBRO, INC.

RESPONDING PARTY:   Defendant and Counterclaim-Plaintiff, ATARI, S.A.

SET NUMBER:   One

TO DEFENDANT AND COUNTERCLAIM-PLAINTIFF ATARI, S.A.:

    Plaintiff and Counterclaim-Defendant Hasbro, Inc. hereby requests that Defendant and Counterclaim-Plaintiff Atari, S.A. answer in full the First Set of Requests for Admissions within 30 days of service hereof, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Rhode Island.

### DEFINITIONS

1. The following definitions and rules of construction shall apply to these requests, and shall be interpreted to the broadest extent possible. Terms not defined below shall have their ordinary and common meanings.

2. "ATARI['S] means the entity "Atari" referred to by Nolan Bushnell and Jeff Lapin in their discussions with the *Los Angeles Times* reporter who wrote the LOS ANGELES TIMES ARTICLE.

3. "BLECHER" means Mark Blecher of Hasbro, Inc.

4. "*D&D*" means *Dungeons & Dragons*™, a fantasy universe created in 1974, and all intellectual property (including but not limited to storylines, settings, characters, games, books, and abilities) relating to the *Dungeons & Dragons*™ universe.

5. "*D&D* GAMES" means *D&D* "Digital Game Products" as that term is defined in the LICENSE AGREEMENT.

6. "NAMCO BANDAI DISTRIBUTION AGREEMENT" means the "Distribution Agreement" by and between Atari Europe, S.A.S., Distribution Partners, S.A.S., Atari France S.A.S., Atari Italia, Atari Hellas EPE, Atari Nordic AB, Atari Benelux BV, Atari Israel, Ltd, A+ Multimedia Ltda Portugal, Atari Iberica SA, Atari Deutschland GmbH, Atari United Kingdom Ltd, Atari Brazil, Atari Asia Holdings Pty, Atari Taiwan Ltd, Atari Korea Ltd, Atari Singapore Pte, Atari Australia Pty Ltd, Atari Hong-Kong Ltd, and Atari NZ Ltd., dated as of February 18, 2009, including any amendments, addenda, appendices, attachments, excerpts, or drafts thereof.

7. "LICENSE AGREEMENT" means the *Dungeons & Dragons* License Agreement by and between Hasbro, Inc. and Infogrames Entertainment S.A., dated as of June 3, 2005, including any amendments, addenda, appendices, attachments, excerpts, or drafts thereof.

8. "LOS ANGELES TIMES ARTICLE" means the article by Ben Fritz entitled "Atari reboot is underway" and published by the *Los Angeles Times* on or about August 3, 2010.

9. "WILSON" means James Wilson of Atari, Inc.

## REQUESTS FOR ADMISSION

1. Admit that the statement in WILSON's October 26, 2009 letter to BLECHER that it was attaching "an excerpt from Section 2.3 of the Distribution Agreement, which indicates that games for which there are contractual restrictions associated with the exploitation rights granted by the third party (such as Hasbro) are excluded from the Distribution Rights" was a representation that the NAMCO BANDAI DISTRIBUTION AGREEMENT, when initially signed by the parties, excluded *D&D* GAMES from the "Distribution Rights" purportedly being conveyed in that agreement.

2. Admit that WILSON attached to his October 26, 2009 letter to BLECHER an excerpt from the NAMCO BANDAI DISTRIBUTION AGREEMENT that stated:

> 2.3. Exclusions
>
> The following Games are expressly excluded from the above Distribution Rights (collectively the "*Exclusions*"):
>
> (iii) To the only extent of their contractual restrictions, Games for which there are contractual restrictions associated with their exploitation rights granted by third parties to Publisher, which prevent the exploitation of said Games by Distributor, in whole or in part, under the Distribution Agreement, it being specified that such contractual restrictions must be imposed at the initiative of the third parties and not the Publisher's.

3. Admit that WILSON did not include in his October 26, 2009 letter to BLECHER the sentence from the NAMCO BANDAI DISTRIBUTION AGREEMENT that immediately follows the portion WILSON excerpted in his letter and that states, "**Appendix 1** exhaustively lists the Games with contractual restrictions as provided for under this Section 2.3(iii) along with the corresponding contractual restrictions. This list shall be updated by Publisher as may be deemed necessary from time to time."

3

4. Admit that Appendix 1 to the NAMCO BANDAI DISTRIBUTION AGREEMENT, when the parties initially signed it, stated that "no Game" was excluded under Section 2.3(iii) from the "Distribution Rights" purportedly being conveyed pursuant to that agreement.

5. Admit that no *D&D* GAME was excluded from the "Distribution Rights" purportedly being conveyed pursuant to the NAMCO BANDAI DISTRIBUTION AGREEMENT when the parties initially signed that agreement.

6. Admit that the statement in the LOS ANGELES TIMES ARTICLE, to the effect that, in the last five years, ATARI "has had four chief executives," is true.

7. Admit that the statement in the LOS ANGELES TIMES ARTICLE, to the effect that, in the last five years, ATARI has "lost more than $700 million," is true.

8. Admit that the statement in the LOS ANGELES TIMES ARTICLE, to the effect that ATARI'S current management "has spent the last year cleaning up Atari's ample financial messes," is true.

9. Admit that Jeff Lapin stated (as quoted in the LOS ANGELES TIMES ARTICLE), directly or in words with the same meaning, that ATARI "was like an old onion that smells really bad and every time you peel away one problem, you find another."

10. Admit that Nolan Bushnell stated (as quoted in the LOS ANGELES TIMES ARTICLE), directly or in words with the same meaning, that ATARI "wasn't just being mismanaged, it was being abused."

11. Admit that Nolan Bushnell stated (as quoted in the LOS ANGELES TIMES ARTICLE), directly or in words with the same meaning, that, by the time he rejoined ATARI'S board of directors in 2010, ATARI had "ended up a shell."

4

12. Admit that the statement attributed to Jeff Lapin in the LOS ANGELES TIMES ARTICLE that ATARI "was like an old onion that smells really bad and every time you peel away one problem, you find another," was true when it was said.

13. Admit that statement attributed to Nolan Bushnell in the LOS ANGELES TIMES ARTICLE that ATARI "wasn't just being mismanaged, it was being abused," was true when it was said.

14. Admit that the statement attributed to Nolan Bushnell in the LOS ANGELES TIMES ARTICLE that, by the time he rejoined ATARI'S board of directors in 2010, ATARI had "ended up a shell," is true.

Dated: October 12, 2010

HASBRO, INC.
By its Attorneys,

*/s/ John A. Tarantino*

John A. Tarantino, Esq. (#2586)
jtarantino@apslaw.com
Todd White, Esq. (#5943)
twhite@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607

Robert M. Schwartz, Esq.
rschwartz@omm.com
Matthew T. Kline, Esq.
mkline@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October 2010, the within document was served upon the following counsel of record via electronic mail and United States First Class Mail:

Michael J. Daly, Esq.
mdaly@pierceatwood.com
Brooks R. Magratten, Esq.
bmagratten@pierceatwood.com
Pierce Atwood LLP
10 Weybosset Street, Suite 400
Providence, RI 02903

Herbert C. Ross, Esq.
Kyle C. Bisceglie, Esq.
Christine W. Wong, Esq.
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, NY 10022

_____
Todd D. White