## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC., <br><br>                 Plaintiff, <br><br>        -against- <br><br> INFOGRAMES ENTERTAINMENT, S.A. a/k/a ATARI, S.A., <br><br>            Defendant. | C.A. No. 09 Civ. 610 (S) (LDA) |

## PLAINTIFF HASBRO, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS [DOCKET NO. 57]

Plaintiff Hasbro, Inc. ("Hasbro") respectfully submits this reply memorandum in support of its Motion to Compel Production of Documents ("Motion") from defendants Atari, S.A., Atari Interactive, Inc., and Atari, Inc. (collectively, "Atari"). From day one, Atari has taken every opportunity to delay resolution of this litigation. Atari's responses (and non-responses) to Hasbro's First Set of Requests for Production (the "Requests") are merely one example of this pattern of delay and obstruction. Faced with a looming discovery deadline and a continued lack of cooperation from Atari on discovery matters, Hasbro filed its Motion to obtain from Atari the relevant documents which should have been turned over voluntarily, and which Hasbro needs to prosecute its case and defend against Atari's counterclaims.

Atari's arguments for refusing to produce relevant documents are based on its disputed theory of what the litigation "is really about." But Atari arrives at its view of what is relevant only by ignoring language in Hasbro's First Amended Complaint ("FAC," Docket No. 31) that undermines its arguments as to why documents are supposedly not relevant, and acting as though Hasbro's Second Amended Complaint ("SAC") does not exist and that leave to file that pleading

will not be granted.  Even worse, Atari is now trying to hide behind European and French privacy

restrictions, claiming that it "has not had the opportunity to determine" whether the documents

sought by Hasbro are located in France.  The issue of European privacy restrictions was in fact

raised nearly one year ago, in March 2010, during the Court's initial status conference.  Hasbro has

been asking for nearly a year whether such alleged restrictions were going to be an issue, without

obtaining a response.  Atari has had more than four months to ascertain and identify the location of

the documents Hasbro has requested.  For Atari to now claim that it still does not know where

things stand or where documents are located defies belief, and further demonstrates that Atari's

objective here is to delay.  Crucially, by not challenging jurisdiction and by asserting counterclaims,

Atari has submitted to the jurisdiction of this Court.  Indeed, Atari is a plaintiff in this Court seeking

counterclaims against Hasbro, yet claims it is immune from discovery.  Atari cannot avoid its

discovery obligations by pointing to alleged French privacy restrictions which, when read properly,

do not bar the production of the documents Hasbro has requested.  Further, Atari voluntarily and

knowingly agreed to produce the documents sought by Hasbro when in 2005 it signed the parties'

License Agreement, which requires the production of these documents.

The parties are less than two months from the discovery cut-off.  Atari has produced no

documents, has not even gathered its documents in many cases, and is hiding behind every

objection possible to avoid moving this litigation along.  The Court should overrule each of Atari's

objections and order that it produce forthwith the documents responsive to Hasbro's Requests.[1]

---

[1] For the sake of efficiency, Hasbro notes that Atari's Opposition is premised almost entirely on the notion that the Court will not grant Hasbro leave to file its proposed SAC.  *See* Docket No. 50 (Hasbro's Motion for Leave to File Proposed SAC).  Hasbro submits that if it is granted leave to file the proposed SAC, this will largely obviate the need for further debate on this motion, and an order overruling Atari's objections and requiring wholesale production of documents responsive to Hasbro's Request will be justified.

## I.      ATARI'S RELEVANCE AND DATE RANGE OBJECTIONS ARE UNTENABLE.

### A.      Atari Misconstrues the Scope of Discovery Under the Federal Rules.

Atari's objection to Hasbro' Motion (the "Opposition" or "Opp.," Docket No. 70) misstates

the legal standards for discovery, and seeks to impose discovery constraints on Hasbro far beyond

those contemplated by the Federal Rules of Civil Procedure ("FRCP").[2]  First, Atari claims that

Hasbro's Requests must be "relevant" as defined by Federal Rule of Evidence ("FRE") 401.  (Opp.

at 11.)  FRE 401 defines "relevant evidence" as evidence "having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence."  In other words, Atari's position is that FRCP

26(b)(1) requires that Hasbro's Requests seek documents that are not only "reasonably calculated to

lead to the discovery of admissible evidence," but that also satisfy the "relevancy" standard of FRE

401. *Id.*  This is incorrect, however.  Atari has erroneously conflated the relevance standard

applicable during discovery under FRCP 26(b)(1), with that governing the admissibility of evidence

at trial under FRE 401.

Indeed, Atari's own authorities make clear that discoverable information need not be

"relevant" under FRE 401.  For instance, in *Walker v. Wall*, C.A. No. 10-178 S, 2010 WL 4137331

(D.R.I. Oct. 20, 2010), plaintiff filed a motion to compel production of documents he alleged were

relevant to his claim of mistreatment by prison employees.  The court granted plaintiff's motion to

compel, holding that "[r]elevant information *does not need to be admissible at trial*" under the

Federal Rules of Evidence "so long as it appears reasonably calculated to lead to the discovery of

---

[2] Atari proposes that the "codifiers of the Federal Rules of Civil Procedure" amend the Federal Rules in response to Hasbro's Requests and "limit the number of categories that can be sought under Rule 34."  *See* Opp. at 3.  Hasbro respectfully suggests that this is not the proper forum to debate whether the FRCP 34 should be amended in the manner proposed by Atari.

admissible evidence." *Id.* at *1 (emphasis added).  Other courts have similarly held that the

standard for "relevance" during discovery is significantly broader than the standard for "relevance"

under FRE 401.  *See, e.g.*, *Nat'l Labor Relations Bd. v. New England Newspapers, Inc.*, 856 F.2d

409, 414 n.4 (1st Cir. 1988) ("While trial evidence is relevant only if it is probative of a

consequential fact, evidence is relevant for discovery purposes even if it only 'appears reasonably

calculated to lead to the discovery' of evidence which would be admissible at trial.") (internal

citation omitted); *Westernbank Puerto Rico v. Kachkar*, No. M8-85 X3 (PART 1), 07-1606 (ADC-

BJM), 2009 WL 856392, at *4 n.4 (S.D.N.Y. 2009) ("Indeed, 'relevance' in the context of Rule 26

of the Federal Rules of Civil Procedure is far broader than the meaning of 'relevance' in the context

of Rule 401 of the Federal Rules of Evidence.").  Atari's arguments and discussion concerning

relevancy standards under FRE 401 are thus completely inapposite.

Next, Atari asserts that, unless Hasbro specifically alleged a fact in the FAC, it is not entitled

to discovery pertaining to the occurrence or non-occurrence of that fact.  According to Atari's view

of discovery, parties would be entitled in discovery only to documents that confirm the facts that

they know to exist.  That is not the law.  The rule provides that discovery "relevant to any party's

claim or defense" may be conducted without the Court's intervention, while broader discovery

("relevant to the subject matter") may be ordered by the Court on a showing of good cause.  Fed. R.

Civ. P. 26(b)(1); *Trombley v. Bank of Am. Corp.*, 636 F. Supp. 2d 151, 153 (D.R.I. 2009).

In construing the "relevant to a claim or defense" standard, Atari stretches this restriction

beyond reason.  For example, Atari seeks to block discovery on Hasbro's request for documents

relating to the delegation of Atari's customer service obligations to anyone else—something Atari

was expressly forbidden from doing under the License Agreement—by arguing that "[t]he only

allegation in the Amended Complaint that Atari delegated any such obligation is the alleged

4

delegation to Namco Bandai after July 1, 2009." (Opp. at 17.) Of course, this is not what Hasbro's

complaint says. To the contrary, the FAC broadly alleges that "Atari improperly delegated the duty

of customer service support and marketing to Namco Bandai, its affiliates, *and/or other third*

*parties*, in a number of large markets around the world." (FAC ¶ 177, emphasis added.) Moreover,

Atari's attempt to constrain Hasbro's discovery rights to the specific incidents Hasbro already

knows about finds no support in the FRCP. Although the 2000 amendments to the FRCP did draw

the above-mentioned distinction between discovery "relevant to a claim or defense" and discovery

"relevant to the subject of the action," these changes were in no way intended to impose the

restrictions Atari posits. Indeed, the Advisory Committee explicitly noted that the very types of

information Atari now tries to block would be discoverable as "relevant to the claims or defenses"

in an action:

> The dividing line between information relevant to the claims and defenses and that
> relevant only to the subject matter of the action cannot be defined with precision. *A*
> *variety of types of information not directly pertinent to the incident in suit could be*
> *relevant to the claims or defenses raised in a given action. For example, other*
> *incidents of the same type, or involving the same product, could be properly*
> *discoverable under the revised standard.* Information about organizational
> arrangements or filing systems of a party could be discoverable if likely to yield or
> lead to the discovery of admissible information. Similarly, information that could be
> used to impeach a likely witness, although not otherwise relevant to the claims or
> defenses, might be properly discoverable. *In each instance, the determination*
> *whether such information is discoverable because it is relevant to the claims or*
> *defenses depends on the circumstances of the pending action.*

Fed. R. Civ. P. 26, *Advisory Committee Notes* (2000 Amendment) (emphasis added). Thus, even

under Atari's narrow misreading of the FAC's allegations, Hasbro is clearly entitled to the

discovery it seeks here.[3]

---

[3] To avoid the foregoing, Atari cites a case quoting a different portion of the Advisory Committee
notes and stating that the "rule change is meant to alert the federal courts that they 'have the
authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to
the parties that they have no entitlement to discovery to develop new claims or defenses' that are

In Section IV below, Hasbro explains on a request-by-request basis how and why each Request at issue is relevant to the claims, defenses, and counterclaims set forth in the operative pleadings.[4]  But even if the Court were to find that Hasbro's Requests were not relevant to the parties' claims and defenses, good cause exists to permit Hasbro's discovery under the broader, "relevant to the subject matter" provision of FRCP 26:

- **Atari's pattern of obstruction, delay, and concealment.**  When Hasbro first sought to understand the nature of some of the troubling events which came to light in 2009, Atari responded with deceit, delay, and obstruction.  Atari obfuscated, answered with half-truths and misstatements, and even assembled misleading versions of key documents to try to persuade Hasbro to abandon its legitimate claims.  (*See, e.g.*, SAC ¶¶ 49-63.)  Faced with this pattern of behavior, Hasbro is reasonably concerned that Atari has not been forthcoming about the full scope of the breaches—and harm to Hasbro's intellectual property—at issue.  Full discovery is necessary to undo Atari's web of concealment and misdirection.

---

outside the scope of those already pleaded."  *Padilla v. Bristol Myers Squibb Holding Ltd. Liability Co.*, Civil No. 04-1003 (PG/GAG), 2005 WL 783076, at *1 (D.P.R. Apr. 4, 2005), *quoting Advisory Committee Notes* (2000 Amendment).  (Opp. at 12.)  Atari then misconstrues the reference to "claims or defenses" in the pleading to mean "specific facts," and on that basis refuses to produce documents relevant to both Hasbro and Atari's *existing* claims and defenses.  Neither *Padilla* nor the Advisory Committee notes, however, stand for the proposition that discovery can be confined only to specifically pled facts.

[4] Atari claims that "Hasbro does not assert that any of the requests in issue are relevant to the defenses or counterclaims in the action."  (Opp. at 12.)  This is demonstrably false.  For instance, Hasbro explained in its moving papers how documents responsive to Request No. 75 are "directly relevant to Atari's own claim that Hasbro has caused Atari to lose profits in excess of $100 million by failing to timely approve Atari's D&D projects."  Docket No. 57-1 at 12-13.  *See also id.* at 5 (documents responsive to Hasbro Request No. 6 "are both relevant and critical to Hasbro's claims *and defenses*"); *id.* at 11 (documents responsive to Request No. 13 are "relevant to the claims and defenses in this action").

- **Hasbro has a contractual right to the documents it seeks.**  Under the parties' License Agreement, Atari is required to maintain for a period of five years records of all transactions relating to the License Agreement and Atari's rights and obligations thereunder. In other words, Atari agreed in writing to keep most of the records and documents that Hasbro now seeks, and to provide them to Hasbro upon request.  Atari has ignored these contractual duties, and unreasonably used this litigation as a shield to justify its failure to turn over such documents to Hasbro.

### B.    Atari Has Misstated the Scope and Breadth of Hasbro's Complaint.

As mentioned above, Atari's objections to Hasbro's Requests largely rest on the notion that discovery concerning the claims and allegations in the SAC is not permissible until the Court formally grants Hasbro leave to amend its complaint.  Even if the Court denies Hasbro's pending motion for leave to amend, Hasbro's discovery is still proper because it is directly relevant to the parties' claims and defense as framed in the FAC, Atari's counterclaims, and the other existing pleadings.

Atari attempts to paint Hasbro's discovery in an unfair light, however, by selectively excerpting portions of the FAC to support its version of what this case is "really" about and ignoring anything in the FAC to the contrary.  For example, Atari claims that nothing of relevance to this case transpired prior to 2009.  To foster this misconception, Atari lists every date of significance from 2009 through 2010 and erroneously concludes that "[a]ll of the factual allegations of misdeeds or contractual failures in the Amended Complaint concern matters that Hasbro alleges occurred after July 1, 2009."  (Opp. at 5-7.)  But Atari ignores that Hasbro's FAC alleges, among other things, that, "On January 24, 2008, [Atari] filed an intent-to-use trademark application with the United States Patent and Trademark Office" for the "Icewind Dale" trademark.  (FAC ¶ 146.) Atari continued to pursue registration of its trademark application for Icewind Dale throughout 2008

and 2009—despite knowing that Icewind Dale was Hasbro's intellectual property. Atari's conduct constituted a violation of the parties' License Agreement, and Hasbro brought suit for this conduct. (FAC ¶¶ 147-163.)  Atari discloses none of this when representing that the FAC "only" concerns events transpiring from July 2009 on.

The claims and allegations pled in the FAC are not as limited in scope as Atari suggests. Time after time, Atari takes Hasbro's specific allegations in the FAC and wrongly concludes that nothing of relevance happened before Hasbro discovered the conduct in question.  For instance, the FAC explains how Hasbro came to discover that Atari had delegated its duties concerning Hasbro's intellectual property, Dungeons & Dragons™, to Hasbro's competitor, Namco Bandai.  (FAC ¶¶ 29-163.)  Atari interprets these allegations to mean that Hasbro is entitled to documents only dating from when Atari sold off its international entities to Namco Bandai.  But Hasbro is entitled to discover the background and details of what transpired here to support its existing Namco Bandai claims.  What licensed activities were the Atari and Namco Bandai entities engaged in at the time of the transfer?  What was the understanding of Atari and Namco Bandai leading up to the transfer? How did D&D fit into the negotiations leading up to the transfer?  Given the information that has come to light thus far, Hasbro is entitled to know the depth of Atari's breaches of contract over the course of the parties' contractual relationship beginning in 2005, and should be allowed access to documents concerning these matters.

### C.   Atari's Temporal Objections Are Unfounded Because It Has Already Conceded That 2005 Forward Is the Relevant Time Frame For Discovery.

Atari objects to Hasbro's Requests seeking documents dated from 2005 forward, and claims that this is an "unreasonable and irrelevant five and one-half year period."  (Opp. at 8-9.) Atari has no basis to object, however, given that Atari previously framed the relevant time period in the same manner in its own discovery requests to Hasbro.

Atari served its First Requests for the Production of Documents ("First Requests") in August 2010, prior to the service of any discovery by Hasbro.  In Atari's First Requests, Atari set the relevant date range as June 3, 2005—the effective date of the parties' License Agreement—to the present:

> Unless otherwise specified, the time period covered by this discovery request is June 3, 2005 through the present, and all individual documents requests shall be interpreted to encompass all documents that relate to such period even though drafted, prepared, or published prior to that period.

Supplemental Declaration of James M. Pearl ("Suppl. Pearl Decl.") ¶ 3, Ex. 2 (Atari's First Requests) at 4 (filed concurrently herewith).  Without exception, Hasbro agreed to produce responsive, non-privileged documents falling within this date range.  *Id*. at ¶ 6.  On October 15, 2010, Atari then served interrogatories seeking information spanning well before 2009.  *Id*. ¶ 4, Ex. 3 (Atari's First Set of Interrogatories) at 7 (Interrogatory Nos. 8-9, requesting that Hasbro "[s]tate and describe in detail all '[l]ost opportunity damages' claimed by Hasbro 'resulting from a number of proposed plans from 2006-2009 that Atari failed to act or execute on'" and "[i]dentify each of the 'proposed plans from 2006-2009' that Hasbro contends Atari 'failed to act or execute on' and for which Hasbro has incurred damages").  And on December 17, 2010, Atari served its Second Requests for Production of Documents ("Second Requests").  *Id*. ¶ 5, Ex. 4 (Atari's Second Requests).  Once again, Atari requested, and Hasbro agreed to produce, responsive, non-privileged documents falling within the identical "June 3, 2005 to present" date range.  *See id*. at 6-7 (requesting, for example, Atari's financial statements from June 3, 2005 to December 16, 2009 that were in Hasbro's possession prior to the commencement of the action, and "[a]ll documents concerning any change of management personnel at Atari at any time during the period June 3, 2005 through December 16, 2009 that were in the possession of Hasbro prior to or as of the commencement of this action").

Atari never explains why the relevant date range should be "2005 to the present" for Atari's discovery, but only from "2009 to present" for Hasbro's Requests, and there can be no justification. Discovery is not a one-way street. The Court should overrule Atari's objections to producing documents pre-dating July 1, 2009.

## II.   ATARI CANNOT REFUSE TO PRODUCE RELEVANT DOCUMENTS BECAUSE OF EUROPEAN PRIVACY LAWS.

### A.   Atari Has Unreasonably Delayed Investigating Whether Its Documents Are Located Abroad.

Atari claims that Hasbro's request for an order confirming Atari's obligation to produce documents located abroad is "premature" because Atari "has not had the opportunity to determine" where the documents sought by Hasbro are located. (Opp. at 23-26.) Not so. The issue of European privacy restrictions was first raised nearly *one year ago*, at the March 31, 2010 initial status conference. Since then, Hasbro has asked repeatedly whether such alleged restrictions were going to be an impediment to document production. *See, e.g.*, Suppl. Pearl Decl. ¶ 2, Ex. 1 (4/15/10 email from T. White to K. Bisceglie) ("With respect to the document production, please keep me informed if there are issues concerning the European privacy laws, or any other impediment to production."); Docket No. 61 (12/23/10 Pearl Declaration, Ex. 3) at 12 ("As we mentioned on the October 29 call, Hasbro needs information on the location of Atari's responsive documents" as "Atari has repeatedly alluded to European privacy restrictions as a potential bar to discovery."). And Atari has had more than *four months* to ascertain and identify the location of responsive documents. With less than eight weeks to go before the close of fact discovery, however, Atari should not be permitted to claim it "still" does not know where its responsive documents are located. This is simply more delay by Atari, which, from the beginning has continually shirked and procrastinated its discovery obligations, forcing Hasbro to file motion after motion simply to get

what it is entitled to under the Federal Rules.  The Court should reject its objections on this basis alone.

**B.**    <u>**European Privacy Laws Do Not Preclude Atari From Producing Documents to Hasbro.**</u>

    1.    *European Union Council Directive 95/46*

The foreign authorities cited by Atari do not provide any basis for it to refuse to produce documents located abroad and responsive to Hasbro's Requests.[5]  Atari first points to The European Union directive, *Council Directive 95/46, on the Protection of Individuals with Regard to the Processing of Personal Data and the Free Movement of Such Data* ("EU Privacy Directive"), which allegedly "forbids the transfer of personal data to a third country unless the third country provides an adequate level of data protection."  (Opp. at 23-24; *see also* Docket No. 70-1 (EU Privacy Directive).)  Atari then asserts that the United States does not provide "an adequate level of data protection," according to the "opinion of the Article 29 Working Party" attached to Atari's Opposition.  (Opp. at 24; *see also* Docket No. 70-2.)  But Atari never establishes—other than by its *ipse dixit* pronouncement—that documents responsive to Hasbro's Requests in fact constitute "personal data."  *See* Opp. at 24 (asserting, without citation to any authority, that "personal data" has "been held to include the names of the senders and recipients on emails").  Nor does Atari disclose that the EU Privacy Directive includes a "litigation exception" provision.  That provision states that "a transfer or a set of transfers of personal data to a third country which does not ensure an adequate level of protection within the meaning of Article 25(2) *may take place* on the condition that … the transfer is *necessary or legally required* on important public interest grounds, *or for the establishment, exercise or defence of legal claims.*"  Docket No. 70-1 at 10-11 (Privacy Directive

---

[5] Atari's specific claim is that production of documents which are "unique" and "only reside in Europe" may violate a European Union directive and French privacy law.  (Opp. at 23-26.)

95/46/EC, Ch. 4, Art. 26.1(d)) (emphasis added). In other words, even assuming the Privacy Directive applies, it expressly contemplates and permits production of the very documents Atari is trying to shield from disclosure.[6]

In *AccessData Corp. v. ALSTE Techs. BmbH*, the court examined a German privacy law with litigation and consent exceptions similar to those in the EU Privacy Directive, and concluded that the party resisting discovery had "not demonstrated that it [had] been unable to obtain consent from [the individuals whose data privacy was at issue] or that it [had] even attempted to seek consent." Case No. 2:08cv569, 2010 U.S. Dist. LEXIS 4566, at *5 (D. Utah Jan. 21, 2010). Like Atari, the party resisting discovery in *AccessData Corp*. "failed to address this particular provision … or explain why it would not apply in the instant case." *Id.* Atari attempts to distinguish *AccessData Corp.* on the basis that it "has not determined which, if any, unique emails might be located exclusively in France, and therefore not had the opportunity to seek consent from any individuals to disclose their names and other personal data by production of emails." (Opp. at 26.) This is precisely Hasbro's point. Atari would rather wait to "some future point"—presumably after the close of discovery—to determine whether responsive documents reside in Europe, at which point it supposedly "will move for a protective order exempting them from disclosure." (*Id.*) Atari has wasted enough time, however. There is no reason to further delay here, or to preserve this issue for another day.

---

[6] Atari also neglects to mention various other provisions of the Privacy Directive which likewise appear to permit the production of Atari's documents to Hasbro, such as the use of contractual clauses to create "adequate safeguards" under Article 26.2, and the exception for data subject consent under Article 26.1(a). *See* Docket No. 70-1 at 10-11.

2.      *French Law No. 78-17*

Atari also points to a French privacy law—French *Law No. 78-17* ("French Privacy

Law")—allegedly forbidding the transfer of "personal data" to a non-European Community country

if it "does not provide a sufficient level of the protection of individuals' privacy, liberties and

fundamental rights with regard to the actual or possible processing of their personal data." (Opp. at

24; *see also* Docket No. 70-3 (French Privacy Law).) But in *Bodner v. Banque Paribas*, 202 F.R.D.

370 (E.D.N.Y. 2000), the court squarely rejected the precise argument raised by Atari here. In

*Bodner,* the court examined this same French Privacy Law—though admittedly prior to that

statute's amendment in 2004—along with a series of other French statutes purportedly blocking

discovery, and concluded that those laws did not present "a compelling, competing French national

interest" sufficient to justify blocking discovery. 202 F.R.D. at 375.

Atari glosses over *Bodner*, and seeks to limit the opinion to only permitting discovery

relating to "alleged wrongful taking from and failure to return money and other assets to Jews in

France during World War II". (Opp. at 25-26.) This is a misreading of the court's opinion,

however, which held:

> Similarly, the French Privacy Law cited by defendants[, Law 78-17,] does not appear
> to be directed at the present circumstances; rather, that law was intended to prevent
> recurrence of past bigotry and anti-Semitic and racist acts that are the very events
> that plaintiffs here seek to investigate. Permitting discovery would not undermine
> the purposes of the Act, while denying plaintiffs discovery would effectively prevent
> them from pursuing this action.

202 F.R.D. at 376. Thus, in *Bodner* the court determined that because the French Privacy Law was

intended to prevent bigotry and anti-Semitic and racist acts, it was not implicated in that case. Of

course, it goes without saying that production of documents by Atari to Hasbro will not foster anti-

Semitic acts, or otherwise undermine the French Privacy Law. Ultimately, the *Bodner* court

concludes that "the use of an appropriate protective order should address the confidentiality

concerns of defendants (and any concerns expressed by French law) with regard to the materials produced." 202 F.R.D. at 376. Here, a protective order is already in place. *See* Docket No. 35 (Stipulated Protective Order). Like in *Bodner*,

> the need for information and time pressure on this litigation … indicate that the application of the Federal Rules is appropriate. Requiring resort to the Hague Convention would consume precious time, and needlessly delay the resolution of this proceeding, particularly should there be continuing tactical measures taken by defendants to avoid discovery sought under the Convention. In short, discovery here should be governed by the Federal Rules, because they are the most effective method of discovery available.

202 F.R.D. at 376 (citations omitted). The same concerns present in *Bodner* apply equally here.

Atari also neglects to mention that the French Privacy Law, like the EU Privacy Directive, contains exceptions where the consent of the data subject is procured, or where the data is "necessary for the establishment, exercise or defense of a legal claim." Docket No. 70-3 at 11 (Art. 8.II(5)). Once again, *AccessData Corp.* is instructive here. There, the court analyzed a German privacy law containing similar exceptions, and noted that the protesting party had failed to demonstrate that it had been unable to obtain consent or explain why the litigation exception did not apply. 2010 U.S. Dist. Lexis 4566, at *5. The court held that, even if the German privacy law did prohibit disclosure, "[i]t is well settled that such [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Id.* at *5-6 (*quoting Société Nationale Industrielle Aérospatiale v. District Court* ("*Aérospatiale*"), 482 U.S. 522, 544 n.29 (1987)). Indeed, the United States Supreme Court has indicated that, in these circumstances, a comity analysis is appropriate. 482 U.S. at 544 n.28. That analysis typically focuses on the following factors:

> (1) the competing interests of the nations whose laws are in conflict; (2) the hardship of compliance on the party or witness from whom discovery is sought; (3) the importance to the litigation of the information and documents requested; and (4) the good faith of the party resisting discovery.

*In re Vivendi Universal, S.A. Sec. Litig.*, 2006 WL 3378115, at *2 (S.D.N.Y. 2006) (*quoting First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 364 (S.D.N.Y. 1997)).[7] These factors all favor Hasbro, not Atari.

First, the interests of the United States are more significant here than those of France (or Europe). "The United States has an obvious interest in the application of its procedural rules to discovery." *Vivendi*, 2006 WL 3378115, at *3. Without minimizing the importance of data protection, the French Privacy Law and EU Privacy Directive afford ample opportunity for protections—opportunities Atari declined to timely explore.

Second, any hardship on Atari is minimal, and certainly not out of proportion to the benefits it has availed itself of under United States law. Atari freely entered into the License Agreement with Hasbro, consented to the jurisdiction of this Court, and filed claims against Hasbro for over $100 million in damages. Having accepted that jurisdiction, Atari is subject to the normal burdens of being a litigant—including routine discovery requests—despite its foreign status. Hasbro's defense against Atari's claims will require access to Atari's documents, wherever they are located. Atari cannot use its foreign status as a shield. *See IRIS Corp. Berhad v. United States*, 84 Fed. Cl. 489, 494 (Fed. Cl. 2008) ("Plaintiff, a foreign-based entity, voluntarily chose to avail itself of this Court's process and may not use its foreign status to avoid or limit appropriate discovery."). Moreover, Hasbro has a contractual right of access to many of the documents sought by the

---

[7] Other courts have used similar formulations of these factors. *See, e.g.*, *Linde v. Arab Bank*, 463 F. Supp. 2d 310, 314 (E.D.N.Y. 2006) (analyzing the degree of specificity of the request, whether the information originated in the United States, and the availability of alternative means of securing the information) (*quoting* Restatement (Third) of Foreign Relations Law of the United States § 442). These factors also favor Hasbro. Hasbro's Requests were narrowly tailored and limited to documents relevant to its claims and defenses, there exists no alternative means to acquire Atari's foreign documents, and although many of the documents may have originated overseas, they were intimately connected with Atari's U.S. business operations.

Requests pursuant to the License Agreement. So, any burden on Atari to locate and produce documents is one that it voluntarily agreed to when it entered into the License Agreement.

In contrast to the burden on Atari of ordering discovery, the burden on Hasbro of denying discovery would be significant. No reasonable alternative means for obtaining the discovery is available, since only Atari has access to its internal records, and the unidentified third parties located abroad who were on the other end of any relevant communications are likely beyond the reach of the Court. *See Linde v. Arab Bank*, 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006) (holding that a series of bank secrecy laws "should not excuse the defendant from being ordered to produce appropriately limited categories of documents and information" where, among other factors, "[t]he transactional and customer information simply cannot be obtained without disclosure of the defendant's records," and the only other sources of that information would be "customers and other participants in the transactions at issue" whose identities were largely unknown).

Third, the documents located abroad are likely of central importance to this litigation. Much of the conduct alleged in the FAC took place outside the United States. Atari's European subsidiaries were actively engaged in licensed activities at the time of the Namco Bandai transaction, and Atari has refused to provide any account of their activities since that time. Atari has likewise refused to provide an account of the negotiations between Atari and Namco Bandai leading up to the transaction. Documents and communications by and between these foreign entities will be critical to proving Hasbro's claims and defending against Atari's counterclaims.

Fourth, Atari clearly has not acted in good faith. As previously explained, for nearly a year Atari has let this issue fester and has done virtually nothing to investigate where its documents are located. Atari's consistent pattern of obstruction and delay weighs heavily in favor of Hasbro on this factor in the comity analysis.

Finally, none of the cases Atari cites support denial of Hasbro's Motion or sustainment of Atari's "foreign privacy" objections.  For example,

- Atari's case-in-chief, *Salerno v. Lecia, Inc.*, concluded in a two paragraph discussion that a German privacy law and the EU Privacy Directive applied to a request for *personnel* files from European nationals.  No. 97-CV-973S(H), 1999 WL 299306 (W.D.N.Y. Mar. 23, 1999).  But in that case, the document request in question was untimely, precluded by the doctrine of collateral estoppel, overly burdensome, and sought irrelevant information beyond the defendant's control.  *Id.* at *1.  Needless to say, none of those circumstances apply here.

- In *Minpeco, S.A. v. Conticommodity Services Inc.*, the court denied discovery on the basis that Switzerland had a very significant interest in bank secrecy laws which applied to the documents to be produced.  116 F.R.D. 517, 524-25 (S.D.N.Y. 1987).  Atari has articulated no similar interest on the part of France or the EU here.  Nor can it.  The documents sought by Hasbro are routine business documents concerning Atari's contractual performance—not personal emails or personal financial information.  Neither the French government nor the European Union has any interest in maintaining the secrecy of such documents.

- In *Trade Development Bank v. Continental Insurance Company*, 469 F.2d 35 (2d Cir. 1972), the court deferred to Swiss law and declined to grant the discovery sought, but only because the bank had made "a good faith effort to obtain a waiver of that restriction from the customers involved."  *Id.* at 40-41.  Here, Atari admits that it has made no such effort.  (Opp. at 26.)  *Trade Development* also explicitly noted "the relative unimportance of the information as to the clients' identity in the present

17

proceeding." *Id.* at 41. As explained above, the information sought by Hasbro is likely to be of central importance to the parties' claims and defenses.

- In *Electro Design Manufacturing, Inc. v. Texas Instruments, Inc.*, the court determined that the discovery at issue was not appropriate where "disclosure … raises concerns of national security for the West German Government," there was a showing of significant hardship by the resisting party, the discovering party was already aware of the underlying subject matter of the agreement in question, and the discovery was of tangential importance. No. CV 89 1843 (JMM), 1990 WL 21105, at *3-5 (E.D.N.Y. Feb. 26, 1990). None of those circumstances apply here.

Given the foregoing, the Court should overrule Atari's objections to producing responsive documents located abroad.

## III. THE COURT SHOULD OVERRULE ATARI'S OBJECTIONS CONCERNING DOCUMENTS SUBJECT TO THIRD PARTY CONFIDENTIALITY AGREEMENTS.

For various Hasbro Requests, Atari committed to produce non-privileged documents but only if they were not otherwise subject to a confidentiality agreement with a third party. *See* Docket No. 59 (Atari's responses to Hasbro's Requests) at 22-23 (Request No. 29); Docket No. 60 (same) at 25-33 (Request Nos. 103-114.) According to Atari,

> [t]o the extent Atari has a confidentiality obligation to a third-party, it cannot abrogate it and provide a document subject to that obligation to Hasbro because there is an order providing that Hasbro, a party to whom Atari is not authorized to disclose the document, can use it only for this action.

(Opp. at 16.) Atari's argument is specious. As Atari knows, the parties negotiated and agreed to a stipulated protective order designed to address the very problem Atari raises. *See* Docket No. 35 (Stipulated Protective Order). In fact, Hasbro requested that Atari agree to an amendment of the parties' protective order to add an additional layer of protection—specifically, an "Attorneys' Eyes

Only" designation.  Atari refused to agree to amend the protective order, however, and that issue is the subject of a pending motion by Hasbro.  *See* Docket No. 67 (Hasbro's motion to amend protective order).

Rather than offer reasoned (or legally-supported) arguments why it is entitled to hide behind unspecified "confidentiality agreements" to avoid fulfilling its discovery obligations, Atari instead seeks to blame Hasbro.  For example, Atari brazenly suggests that it has not had sufficient opportunity to consider and address this issue in the four months since Hasbro served its Requests, and asserts that "[a]t a minimum, [it] seeks the opportunity to collect, review and identify any documents and consider its legal obligations to third parties before agreeing to categorically produce such documents."  (Opp. at 16.)  In other words, Atari's solution is further delay.  But the time for Atari to hide is over.  Hasbro cited authority in its moving papers squarely holding that such confidentiality agreements with third parties are not grounds for refusing to produce responsive documents.  *See Dunkin' Donuts Inc. v. Mary's Donuts, Inc.*, 206 F.R.D. 518, 520 (S.D. Fla. 2002) (requiring plaintiffs to provide discovery despite confidentiality agreement with non-party because the protective order in place can protect the confidential nature of that information).  Atari offers no authority holding otherwise.  The Court should therefore overrule Atari's objections and order it to immediately produce documents responsive to Hasbro's Requests.

## IV.   THE COURT SHOULD ORDER THAT ATARI PRODUCE NON-PRIVILEGED DOCUMENTS RESPONSIVE TO HASBRO'S DOCUMENT REQUESTS.

In the following pages, Hasbro explains on a request-by-request basis how and why each Request at issue is relevant to the claims, defenses, and counterclaims set forth in the operative pleadings.

- **REQUEST 4:** *All DOCUMENTS that RELATE TO ATARI'S sublicensing of rights under the LICENSE AGREEMENT.*  Docket 58-1 (Hasbro's First Requests) at 13.  Atari claims

this request encompasses irrelevant documents because it sweeps in documents relating to Atari's sublicense to Turbine, not just the sublicensing to Namco Bandai.  (Opp. at 13.)  But any unauthorized sublicensing constitutes a breach of the License Agreement—one of Hasbro's key claims.  Moreover, all authorized sublicensing is relevant to Hasbro's claims of underperformance and lack of promotion, and Atari's potential defenses to those claims.

- **REQUEST 5:** *All COMMUNICATIONS between ATARI and DISTRIBUTION PARTNERS RELATING TO D&D*.  Docket 58-1 at 13.  Even under Atari's artificially constrained theory of Hasbro's case, the allegations concerning Distribution Partners are of central importance. Hasbro claims that Atari's international subsidiaries were engaged in licensed D&D activities when they became Distribution Partners, and that they continued conducting licensed activities after they became Namco Bandai entities.  Hasbro is entitled to know the nature of the involvement of each Distribution Partners entity in exploiting the D&D license.  *Any* communication between Atari and Distribution Partners relating to D&D is highly relevant to understanding this relationship.  Atari, however, offered to produce only "those communications between Atari and Distribution Partners that explain 'what rights, if any, were granted by Distribution Agreement dated as of February 18, 2009,' which would shed light on whether and, if so, to what extent it constituted a sublicense.'"  (Opp. at 13-14.)  In other words, Atari will only produce documents that purport to *explain* the contract between Atari and Distribution Partners, not any documents showing the actual practices and customs between the entities.  Legal analyses purporting to explain the contract would be relevant, but are unlikely to exist or will be privileged.  More likely to exist are documents reflecting the role that D&D played in the business between Atari and

Distribution Partners. Hasbro is entitled to documents relevant to prove or disprove its claims—and need not be relegated to the summary-type documents Atari offers here.

- **REQUEST 6:** *All COMMUNICATIONS between ATARI and NAMCO RELATING TO D&D.* Docket 58-1 at 13. Hasbro asked for all communications between Atari and Namco Bandai relating to D&D games. Atari refused to produce documents from before July 1, 2009, and then Atari's "compromise" offer was to produce communications sent or received after January 2009. (Opp. at 14.) Atari claims that "Hasbro's speculation that maybe something in 2008 is relevant to events it alleges commenced on July 1, 2009 does not furnish any basis for pre-2009 discovery." (*Id.*) Atari cites no authority for this nonsensical limitation on relevant discovery. Hasbro is entitled to know the background leading up to the events of the second half of 2009 and Atari's sublicensing to Namco Bandai. Any communications between Atari and Namco Bandai relating to D&D games at any point during the relevant time period (June 2005 to the present) are relevant to Hasbro's claims or Atari's defenses in this action. Hasbro is also entitled to know the contours of the Namco Bandai-Atari relationship with respect to its intellectual property, particularly where Atari has fraudulently concealed the nature of this relationship from Hasbro. Atari's assertion that Hasbro is not entitled to "speculate" as to the existence of documents leading up to Hasbro's discovery of Atari's breaches would essentially undo the entire civil discovery framework.

- **REQUEST 13:** *All DOCUMENTS, including but not limited to meeting notes and minutes, that RELATE TO meetings, conversations, or communicative exchanges of any kind of any committee, group, or individuals (including but not limited to meetings of the board of directors) within ATARI or between ATARI and a non-ATARI entity or individual that*

*RELATE TO D&D, the LICENSE AGREEMENT, LICENSED ACTIVITIES, D&D GAMES, DISTRIBUTION PARTNERS, or NAMCO.*  Docket 58-1 at 14.  Atari's objection to this request is that it would sweep up irrelevant matters.  (Opp. at 14-15.)  But all of these topics are at issue in this case, and Hasbro has a contractual right to these documents under the License Agreement.

- **REQUEST 26:**  *All DOCUMENTS that RELATE TO the sale of any of ATARI'S business interests or operations in Europe.*  Docket 58-1 at 15.  **REQUEST 39:** *All DOCUMENTS that RELATE TO ATARI'S decision to exercise its "put option" to divest its remaining stake in DISTRIBUTION PARTNERS.*  Docket 58-1 at 17.  **REQUEST 40:**  *All DOCUMENTS that RELATE TO the exercise of the "put option" and NAMCO'S purchase of ATARI'S remaining interest in DISTRIBUTION PARTNERS in July 2009.*  Docket 58-1 at 17.  Atari interprets these requests to "relate to Hasbro's theory that the sale to Namco Bandai Games Europe harmed Atari's customer service support for D&D games in Europe after July 1, 2009," but then complains that "these requests ask for a mass of material having nothing to do with that theory."  (Opp. at 15.)  These requests are relevant not just for the limited purpose Atari articulates, but also because they relate to Hasbro's claim that Atari's financial mismanagement has impeded its ability to perform under the License Agreement.  Hasbro is entitled to learn whether the sell-off of international operations represented a strategic business shift in the best interests of the D&D brand, or—more likely—a fire sale of assets and capabilities that hindered Atari's ability to perform under the contract but were necessary to allow the company to stay afloat.

- **REQUEST 33:**  *All DOCUMENTS and COMMUNICATIONS that RELATE TO the DISTRIBUTION AGREEMENT.*  Docket 58-1 at 16.  The Distribution Agreement is the

document at the center of Atari's fraud and many of its contractual breaches. Hasbro is entitled to documents relating to this pivotal agreement.

- **REQUEST 50:** *All DOCUMENTS that RELATE TO ATARI'S obligations to provide customer service support and marketing under the LICENSE AGREEMENT.* Docket 58-1 at 18. Atari claims that this request is "vague" because it is not clear "whether it embraces not only documents explaining any such obligations but also documents incidental to the execution of such and performance thereunder." (Opp. at 17.) As written, the request is not "vague" at all. It plainly calls for documents relating to the identified obligations, which would include explanations, as well as discussions, plans, and references to those obligations.

- **REQUEST 51:** *All DOCUMENTS that RELATE TO the delegation, assignment, or assumption of ATARI'S customer service obligations to or by any other PERSON.* Docket 58-1 at 18. Atari claims that it is not required to produce documents regarding delegation of customer service obligations to entities other than Namco Bandai, saying that "[t]he only allegation in the Amended Complaint that Atari delegated any such obligation is the alleged delegation to Namco Bandai after July 1, 2009." (Opp. at 17.) This is simply incorrect. The FAC alleges that "Atari improperly delegated the duty of customer service support and marketing to Namco Bandai, its affiliates, and/or other third parties, in a number of large markets around the world." (FAC ¶ 177.) Even if Atari's characterization of the FAC were accurate—which it is not—Atari's suggestion that Hasbro is only entitled to discovery on the instances of this breach that it already discovered through its own investigation mischaracterizes the proper scope of discovery. *See* Fed. R. Civ. Proc. 26, *Advisory*

*Committee Notes* (2000 Amendment) (noting "other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard").

- **REQUEST 52:** *All DOCUMENTS that RELATE TO the provision of customer support or technical support for D&D GAMES, including phone service and the creation, updating, and maintenance of game-related websites, by any PERSON, including all DOCUMENTS in the possession of ATARI'S former European subsidiaries.* Docket 58-1 at 18.

**REQUEST 53:** *All COMMUNICATIONS that RELATE TO the provision of customer support or technical support for D&D GAMES.* Docket 58-1 at 19. **REQUEST 57:** *All DOCUMENTS that RELATE TO the provision of customer support or technical support for D&D GAMES before, during, and after ATARI'S transaction involving DISTRIBUTION PARTNERS and NAMCO.* Docket 58-1 at 19. Atari argues that these requests should be bounded to documents dated from late 2009 forward, as "the only allegation[s] as to customer service are those concerning alleged failures to provide support starting in Fall 2009 and delegation to Namco Bandai of support after July 1, 2009." (Opp. at 18.) Again, Atari misconstrues the allegations in the FAC. Hasbro plainly alleges that "Atari's improper delegation of its customer service support duties and operation of localized marketing websites to Namco Bandai, its affiliates, and/or other third parties is a direct and material breach of the License[.]" (FAC ¶ 182.) It also alleges a material breach of the License Agreement because "Atari's non-responsiveness to customer questions and/or failure to maintain the telephone or e-mail customer support locations it has advertised does not meet the requisite standard as provided under the License." (*Id.* ¶ 178). In addition, Hasbro alleges that Atari violated the covenant of good faith and fair dealing because "Atari has failed to provide the customer service support required under the License, and has

expressly or impliedly sublicensed the rights and obligations of providing customer support services to one or more third parties without Hasbro's authorization," (*id.* ¶ 192), and because "Atari has not provided the customer support service at the requisite level." (*Id.* ¶ 193). Finally, Hasbro's FAC alleges that "Atari has directly and materially breached the License by failing to use commercially reasonable efforts to promote the D&D Digital Games and undertake the licensed activities in a diligent manner, including without limitation, by ceasing to support D&D Digital Games through websites and customer support contacts that are disconnected or are not answered, *and* by allowing Namco Bandai to provide customer service support and operate localized marketing websites featuring D&D Digital Games." (FAC ¶ 186) (emphasis added).

- **REQUEST 54:** *Any agreements between ATARI and any other PERSON for the provision of customer support for D&D GAMES.* Docket 58-1 at 19. Atari insists that "the Amended Complaint complains only about customer service in and from November 2009 … and only about such support in the territory covered by the Distribution Agreement." (Opp. at 18.) Again, repeating this mischaracterization does not make it true. As described above, Hasbro's allegations in the FAC regarding customer support failures are not limited to the Namco Bandai context, either chronologically, geographically, or topically.

- **REQUEST 55:** *All COMMUNICATIONS and DOCUMENTS that RELATE TO the quality, accuracy, completeness, and/or timeliness of customer support for D&D.* Docket 58-1 at 19. Atari says the FAC "only alleges customer service failings commencing in November 2009." (Opp. at 18.) This is demonstrably false. For the reasons described above, Hasbro's customer service claims are not limited in the manner Atari claims.

- **REQUEST 56:** *All DOCUMENTS that RELATE TO the construction, maintenance, or updating of any website RELATING TO any D&D GAME.* Docket 58-1 at 19. Atari states that "Hasbro has objected in the Amended Complaint to websites it visited in and after November 2009 ... [but r]ather than limiting itself to those, the only ones in issue, Hasbro asks Atari to produce irrelevant documents concerning numerous details as to all websites, starting from June 2005." (Opp. at 19.) This argument suffers from the same defect that permeates Atari's Opposition—it rests on an inaccurate and absurdly restrictive understanding of relevance. Atari owed Hasbro a contractual duty to construct, maintain, and update websites over the course of the contractual relationship. Hasbro's specific allegations concerning the known inadequacies of Atari's efforts in 2009 do not limit Hasbro's discovery rights to only those incidents. Hasbro is entitled to discovery to understand the full scope of Atari's breach of this provision.

- **REQUESTS 58-69:** *All DOCUMENTS relating to the provision of customer service and/or technical support for D&D GAMES in [country] by [local Atari entity], [Local NBP entity], or any other ATARI or NAMCO entity.* (Countries are Germany, Italy, France, Spain, Belgium, UK, Asia and Australia, Brazil, China, the Netherlands, Sweden, Portugal.) Docket 58-1 at 19-20. Again, Atari rests its objection on the misstatement that "the Amended Complaint objects only to customer service and technical support in and from November 2009." (Opp. at 19.) This is not the case, for the reasons described above.

- **REQUEST 70:** *All DOCUMENTS relating to the provision of customer service and/or technical support for D&D GAMES in the United States.* Docket 58-1 at 20. **REQUEST 71**: *All DOCUMENTS relating to the provision of customer service and/or technical support for D&D GAMES in any country, territory, region, nation, or area, not listed*

*above, by ATARI, NAMCO, or any other entity.*  Docket 58-1 at 21.  Atari claims that "the Amended Complaint does not allege any customer service or technical support failures in the United States and these other countries, and nothing about any service support failures anywhere prior to November 2009." (Opp. at 18.)  Again, this is false.  The FAC specifically alleges that, "[i]n early-December, 2009, calling the only U.S. telephone number listed on Atari.com results in a recorded message stating that Atari no longer provides telephone customer service support, and directing customers to use the online customer support tool on Atari.com" (FAC ¶ 121.)  It also claims that "Atari's non-responsiveness to customer questions and/or failure to maintain the telephone or e-mail customer support locations it has advertised does not meet the requisite standard as provided under the License," (*id.* ¶ 178), in material breach of the contract between the parties, that "Atari has failed to provide the customer service support required under the License, and has expressly or impliedly sublicensed the rights and obligations of providing customer support services to one or more third parties without Hasbro's authorization.," (*id.* ¶ 192), and that "Atari has not provided the customer support service at the requisite level," (*id.* ¶ 193), supporting Hasbro's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

- **REQUEST 74:** *All DOCUMENTS that RELATE TO the allegation in the ANSWER that ATARI "has already exceeded its contractually-required minimum 'property development costs' investment of $25 million during the period from June 3, 2005 to May 31, 2010."* Docket 58-1 at 21.  **REQUEST 80:** *All DOCUMENTS that RELATE TO any expenditures towards the minimum "property development costs" contemplated by the LICENSE AGREEMENT.*  Docket 58-1 at 22. Atari complains that complying with these requests will

be an "incredibly burdensome job," and that it will include extraneous, irrelevant material. (Opp. at 20.)  It also suggests that "Hasbro chose to proceed under its contract and audit Atari," as if that relieves Atari of its discovery obligations.  Unfortunately, Hasbro can no longer trust Atari to describe its expenditures by producing only summary documents.  Atari injected its "property development costs" as an issue in this case, and Hasbro is entitled to test and substantiate that issue.  These documents also bear relevance to Hasbro's claim that Atari has breached its contractual obligations to develop and promote D&D games.

- **REQUEST 75:**  *All DOCUMENTS that RELATE TO ATARI'S plans at any point to develop any D&D GAME.*  Docket 58-1 at 21.  Atari voices no objection to Request No. 75 in its Opposition, and has presumably withdrawn any objection to this Request.  In any event, this request is plainly relevant to claims in the FAC, SAC, and Atari's own counterclaim for $100 million in damages based on Hasbro's purported interference with Atari's development plans.

- **REQUEST 76:**  *All DOCUMENTS that RELATE TO ATARI'S plans at any point to sublicense the development, marketing, distribution, or sale of any D&D GAME.*  Docket 58-1 at 21.  **REQUEST 78:**  *All COMMUNICATIONS between ATARI and actual or potential sublicensees regarding any actual or proposed sublicensing of ATARI'S rights under the LICENSE AGREEMENT.*  Docket 58-1 at 21.  Atari argues that "only plans for sublicensing and proposed sublicensing in 2009 and 2010 are at issue in the claims or defenses in this action[,]" so "pre-2009 documents are irrelevant."  (Opp. at 21.)  This is inaccurate.  In the FAC, Hasbro broadly alleged that Atari has failed to "use commercially reasonable efforts to promote the D&D Digital Games and undertake the licensed activities

in a diligent manner." (FAC ¶ 186.)  Hasbro is therefore entitled to relevant documents spanning over the entire contractual period—2005 to the present.

- **REQUESTS 103-114:**  *All COMMUNICATIONS between ATARI and [actual or potential sublicensee] that RELATE TO D&D*; and *All DOCUMENTS that RELATE TO negotiations, discussions, meetings, or proposals between ATARI and [actual or potential sublicensee] concerning D&D.*  Docket 58-1 at 24-25.  Here, Atari only agreed to produce documents not subject to a confidentiality agreement with a third party.  (Opp. at 21.)  For the reasons described above, Atari is not entitled to avoid its discovery obligations by referring to unspecified contracts with third parties, particularly where a protective order is in place and it owes Hasbro a contractual and good faith duty to provide access to such documents.

- **REQUEST 118:**  *All DOCUMENTS, including all COMMUNICATIONS, that RELATE TO the TURBINE LAWSUIT.*  Docket 58-1 at 26.  **REQUEST 120:**  *All DOCUMENTS that RELATE TO the decision to settle, and settlement of, the TURBINE LAWSUIT.*  Docket 58-1 at 26.  Atari objects that the documents relating to Turbine's allegations of Atari's failure to promote Turbine's D&D game are not relevant to Hasbro's lawsuit claiming that Atari has failed to promote D&D adequately.  (Opp. at 20.)  This is not the case.  Hasbro has alleged in the FAC that Atari failed to adequately promote D&D games, and is entitled to discovery on another known instance of that failure—in the Turbine context.  Of course, Hasbro recognizes that Atari is entitled to withhold and log any privileged and/or work product documents responsive to these requests.

- **REQUESTS 121-132:**  *All DOCUMENTS furnished to the Los Angeles Times, or to those working with or on behalf of it, in connection with the LOS ANGELES TIMES ARTICLE.*  (121.)  *All COMMUNICATIONS to or from the Los Angeles Times, or to those working with*

*or on behalf of it, in connection with the LOS ANGELES TIMES ARTICLE.  (122.)  All*

*DOCUMENTS that RELATE TO the LOS ANGELES TIME ARTICLE.  (123.)  All*

*DOCUMENTS that RELATE TO the statement by Jeff Lapin in the LOS ANGELES TIMES*

*ARTICLE that ATARI'S financial state has been "like an old onion that smells really bad*

*and every time you peel away one problem, you find another."  (124.)  All DOCUMENTS*

*that RELATE TO the statement in the LOS ANGELES TIMES ARTICLE that ATARI "is*

*trying to rebuild itself after years of chaos, false starts and financial losses." (125.)  All*

*DOCUMENTS that RELATE TO the statement in the LOS ANGELES TIMES ARTICLE*

*that, "[i]n the last five years, as part of the public French company Infogrames, [ATARI]*

*has had four chief executives and lost more than $700 million."  (126.)  All DOCUMENTS*

*that RELATE TO the statement in the LOS ANGELES TIMES ARTICLE that ATARI'S*

*executive team "has spent the last year cleaning up Atari's ample financial messes."  (127.)*

*All DOCUMENTS that RELATE TO the statement in the LOS ANGELES TIMES ARTICLE*

*that ATARI'S financial resources are "akin to those of many tech start-ups."  (128.)  All*

*DOCUMENTS that RELATE TO the statement in the LOS ANGELES TIMES ARTICLE that*

*"Atari doesn't have enough money at its disposal to make and market a major video game*

*like Call of Duty."  (129.)  All DOCUMENTS that RELATE TO the statement in the LOS*

*ANGELES TIMES ARTICLE that, over the past decade, ATARI "borrowed hundreds of*

*millions of dollars to fund an acquisition spree, but was unable to effectively integrate its*

*assets or maintain a healthy balance sheet."  (130.)  All DOCUMENTS that RELATE TO*

*the statement in the LOS ANGELES TIMES ARTICLE that, "[a]s losses mounted, [ATARI]*

*ended up having to sell development studios, intellectual property and its European*

*distribution business."  (131.)  All DOCUMENTS that RELATE TO the statement by Nolan*

*Bushnell in the LOS ANGELES TIMES ARTICLE that ATARI "wasn't just being mismanaged, it was being abused," and that "[i]t ended up a shell."* (132.)  Docket 58-1 at 26-28.  Atari claims it is not required to produce documents responsive to these requests because Hasbro's claims regarding Atari's financial state are only alleged in the SAC. (Opp. at 21.)  This is not true, however.  Hasbro does in fact describe in the FAC Atari's failure to promote the D&D brand, and discusses the instability and turmoil at Atari during the parties' relationship.  (*See* FAC ¶ 28.)  Hasbro is thus entitled to discovery on the issue of *why* Atari has failed to perform.  Even if such allegations were not encompassed by the FAC, this discovery is also relevant to Atari's damages claims and allegations that Hasbro interfered with Atari's business operations.  Hasbro is entitled to defend against those claims by analyzing discovery directed to the issue of how Atari planned to develop and use the D&D brand with the limited resources at its disposal.

## V.  **CONCLUSION**

For all the foregoing reasons, Hasbro respectfully requests that the Court enter an order overruling Atari's objections and compel Atari to produce forthwith the documents responsive to the specific requests for production addressed herein and in Hasbro's moving papers.

Dated:  February 4, 2011

                                                    HASBRO, INC.
                                                    By its Attorneys,


                                                    /s/ Todd D. White
                                                    Todd D. White

Robert M. Schwartz (*pro hac vice*)                 John A. Tarantino, Esq. (#2586)
rschwartz@omm.com                                   jtarantino@apslaw.com
Matthew T. Kline (*pro hac vice*)                   Todd D. White, Esq. (#5943)
mkline@omm.com                                      twhite@apslaw.com
James Bo Pearl (*pro hac vice*)                     ADLER POLLOCK & SHEEHAN P.C.
jpearl@omm.com                                      One Citizens Plaza, 8th Floor
Drew E. Breuder (*pro hac vice*)                    Providence, RI  02903-1345
dbreuder@omm.com                                    Tel:     (401) 274-7200
O'MELVENY & MYERS LLP                               Fax:     (401) 351-4607
1999 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-6035
Tel:     (310) 553-6700
Fax:     (310) 246-6779

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of February 2011, an electronic copy of the within document was served upon the following counsel of record via the PACER/ECF system:

Brooks R. Magratten, Esq.
bmagratten@pierceatwood.com
Michael J. Daly, Esq.
mdaly@pierceatwood.com
Pierce Atwood LLP
10 Weybosset Street, Suite 400
Providence, RI  02903

Kyle C. Bisceglie, Esq.
Kbisceglie@olshanlaw.com
Herbert C. Ross, Esq.
hross@olshanlaw.com
Peter M. Sartorius
psartorius@olshanlaw.com
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, NY  10022


*/s/ Todd D. White*
Todd D. White